KELLOGG (WEED v.). See Case No. 17,345.

## Case No. 7,668.

KELLOM et al. v. EASLEY et al.

[1 Dill. 281; 2 Abb. U. S. 559; 3 Am. Law T. Rep. U. S. Cts. 119; 2 Chi. Leg. News, 304; 5 Am. Law Rev. 181.] [1]

Circuit Court, D. Nebraska. May Term, 1870. [2]

PRE-EMPTION ACT—ASSIGNMENT BY PRE-EMPTIONER — CONVEYANCE BY PRE-EMPTIONER BEFORE PATENT ISSUED—BILL OF REVIEW — WHAT NECESSARY TO BE STATED.

1. Under the act of congress of September 4, 1841 (5 Stat. 453), relating to pre-emption of the public lands, and which in the twelfth section provides that "all assignments and transfers of the right hereby secured prior to the issuing of the patent shall be null and void," a pre-emptioner, although he has a certificate of purchase, cannot, it seems, prior to the issue of the patent, convey the land.

2. A conveyance made by a pre-emptioner before patent issued, and where his entry was set aside and no patent ever issued to him, was held to be incapable of operating, either by way of grant or estoppel.

3. A bill of review should state the former proceedings, and wherein the party exhibiting it considers himself aggrieved; the sufficiency of allegations in this respect considered and decided.

Hearing upon a bill of review.

Harrison Johnson, under the act of September 4, 1841 (5 Stat. 453), pre-empted, and in 1857 entered, by virtue of that act, the premises in question in this suit; and afterwards, during the latter year, conveyed the premises, by absolute deed with warranty,

[1] [Reported by Hon. John F. Dillon, Circuit Judge, and by Benjamin Vaughn Abbott, Esq., and here compiled and reprinted by permission. 5 Am. Law Rev. 181, contains only a partial report.]
[2] [Affirmed in 14 Wall. (81 U. S.) 279.]

to one Test. to secure a sum of money borrowed by him from Easley and Willingham, and for which he executed to them his promissory note. Test subsequently conveyed to Willingham. This debt to Easley and Willingham was never paid. The land thus preempted by Johnson was near to, if not partly within the city of Omaha; and that city contested, before the land department of the United States, at Washington, the validity of Johnson's pre-emption right and entry; and such proceedings were had that Johnson's entry was vacated and set aside, and the land ordered to be sold at public sale by the local land officers at Omaha. Pending this contest, Johnson was embarrassed with debts, and it is quite probable that the order vacating his entry and directing the sale of the land was made with his consent, if not in part by his procurement. The officers fixed upon August 18, 1860, as the date of the sale of the one hundred and sixty acres on which Johnson had claimed the pre-emption right. His creditors met with a view to bid upon the land, which, by this time, had become of considerable value. Prior to the sale, a meeting of Johnson and his creditors was held, at which Johnson proposed, in substance, that the creditors should surrender and cancel their claims against him; that they might then bid in, without opposition from him, eighty acres of this land; and that his mother should then be allowed to bid in the other eighty acres without opposition from the creditors. Easley and Willingham, and also one Beers, claiming to be mortgagees, did not consent to this proposition, because the other creditors would not recognize their priority, and insisted that all the creditors should stand on an equal footing; and these mortgage creditors left the meeting before the final agreement was concluded between the assenting creditors and Johnson. That agreement was reduced to writing on the morning of the day on which the sale was to take place, and was signed by Johnson and nine of his creditors; the mortgagees and certain other creditors, absent or not assenting, and representing about one-half in amount of Johnson's debts, did not sign the contract, or come into the arrangement. By this contract, the creditors executing it agreed that the principal sum and ten per cent. interest should be the basis for ascertaining the amount due to them severally by Johnson; three persons were named as "a committee, whose duty it should be to ascertain the just amount due from Johnson on the above basis, which shall be deemed the true amount, and from whose finding there shall be no appeal;" the creditors were to present their claims to the committee without delay, "with such evidences as they may have of the genuineness thereof, in default whereof the creditors so in default shall be debarred from any benefit under this agreement, and the said Johnson shall be forever discharged from all liability

to them and the benefits which they would have derived shall revert and go to the said Johnson." By the contract, it was provided also, that Kellom, one of the creditors, should buy in eighty acres in trust for himself and the other creditors, to be divided between the creditors in proportion to the amount of their claims as found due from Johnson to them by the committee in the manner above stated. The sale took place; Kellom bought in one eighty acres at the minimum price, and Mrs. Johnson the other at the same price. One of the creditors, Smith, who signed the agreement, presented his claim, evidenced by a promissory note, to the committee. The committee required of him additional evidence of his debt, failing to produce which his claim was not allowed by the committee. It amounted to one thousand and thirteen dollars, and constituted (in round numbers) one-ninth part of the aggregate sum of the claims of all the creditors who signed the contract. Kellom shortly afterwards conveyed to the creditors who signed the contract, excepting Smith, all of the eighty acres, except the parcel retained by him on account of his own debt. That is to say, the whole eighty was partitioned between Kellom and the other creditors who signed the contract, excluding Smith. In the partition it was considered that Smith had no right, and that Johnson was not entitled to the share that would have fallen to Smith had his debt been recognized by the committee. Afterwards, in July, 1863, Willingham and Easley filed a bill in equity against Johnson, Kellom, and others, claiming that they were mortgagees of Johnson, by reason of the deed from him to Test, and from Test to Willingham, before mentioned. They also claimed that the contract between Johnson and the creditors was, that the eighty acres bid in by Kellom, were to go to pay all of the debts of Johnson, whether the creditors' names were affixed to the contract or not, and that if any of the creditors should not come in, that Johnson was to have such portion of the eighty acres as would have fallen to such, had they acceded to the arrangement; that one-half the amount did not come in, and hence, on this theory, Johnson was entitled to one-half of the land, and they, Willingham and Easley, as mortgagees, were entitled to a decree of foreclosure as against this interest. Kellom and the other defendants resisted this bill; testimony was taken; the original agreement was not produced, nor any copy thereof; secondary evidence of its contents was given, and at the May term, 1867, of this court, a decree was passed sustaining the view of Willingham and Easley, holding that Johnson was entitled to an undivided half of the eighty acres purchased by Kellom, and that Willingham and Easley's mortgage was a lien upon this interest; and subjecting it to the payment of the mortgage debt. In the November following, Kellom and others (defendants to the original bill), filed the present bill of review, making Easley and Willingham and others defendants thereto. In the bill of review it was alleged that the decree was erroneous on the face thereof, in certain particulars specified; and it was particularly alleged that the complainants therein had, since the decree was made, discovered, for the first time, a copy of the written contract of August 18, 1860, between Johnson and his creditors, and that this established the agreement to be as they maintained it was, and not to be as found by the decree of the court. Answer was made and testimony taken upon the bill of review. What purported to be a copy of the agreement between Johnson and nine of his creditors was produced; this showed that the contract was made between Johnson and "certain of his creditors," not all of them, and that only those who signed were to be entitled to its benefits. Among others it was signed by the creditor Smith, whose claims the committee rejected, as before mentioned.

Daniel Gantt, for complainants.
J. M. Woolworth, for defendants.

Before DILLON, Circuit Judge, and DUNDY, District Judge.

DILLON, Circuit Judge. If Willingham and Easley have no lien on the land which they are seeking to subject to their debt against Johnson, or if Johnson has no interest in this land, in either event their bill to foreclose cannot be maintained.

The first inquiry is: Have Willingham and Easley any lien on the land in question? The basis of their claim to a lien is the deed from Johnson to Test. Johnson, it will be recollected, pre-empted the land under the act of congress of September 4, 1841, and after he had entered it, and before his entry was canceled by the department, he made the deed to Test. This deed is absolute in form, and contains covenants of warranty. It was, in fact, a mortgage, having been made to secure money borrowed by Johnson of Willingham and Easley. No patent was ever issued to Johnson under his pre-emption and entry. Subsequently, the land in question was sold by the United States to Kellom at the time and under the circumstances appearing in the statement of the case. It is claimed by Kellom and those whose interests are adverse to Willingham and Easley, that the latter have no lien, because the deed from Johnson, which is relied on to create such lien, is absolutely void.

This objection is based upon and involves a construction of section 12 of the aforementioned act of September 4, 1841, which provides that "all assignments and transfers of the right hereby secured, prior to the issuing of the patent, shall be null and void."

Does this intend to prohibit the pre-emptioner from all alienations of the property

which he has acquired under the pre-emption act, prior to the issuing of the patent? Or does it intend simply to prevent the transfer of the right to pre-empt? That it means the former, was, by Mr. Justice Miller, expressed to be his opinion in the case of Beers v. Kellom [unreported], decided in this court, and arising out of the transactions now in controversy. This view seems to be the one best sustained by the terms of the statute, which, when plain, should be regarded and followed by the courts, and not frittered away by subtle and nice refinements.

Until payment made for the land and certificate of purchase procured, the pre-emptioner has nothing which he could assign or transfer. If, after certificate of purchase is obtained, there was intended to be no restriction on the disposition of the land by the pre-emption purchaser, why did the act use the words, "prior to the issuing of the patent?" If such restriction was intended, how natural the use of the words last quoted.

The other view is that the "right secured" is the right to pre-empt, that is, to purchase the land on certain terms and conditions preferably to others, and this right is fully secured when the purchase is made of the United States. The right thus preferably to purchase it is admitted cannot be transferred, and it is this alone (it is argued) which is prohibited. If so, why did the statute use the words, "prior to the issuing of the patent," instead of "prior to the issuing of the certificate?"

Again, this view best accords with the obvious purpose and policy of the pre-emption privilege. The object of the government was in part to induce settlements upon the public lands, but chiefly to confer the preferable right to purchase upon those persons, usually in indigent circumstances, who actually settled or improved them. It was not to aid the speculator in lands. Marks v. Dickson, 20 How. [61 U. S.] 501, 505.

It is plain that pre-emptions merely for purposes of speculation will be less likely to be made if the pre-emptor is obliged, before alienating, to wait for the patent to issue.

Again, there was a similar provision in the prior act of May 29, 1830 (4 Stat. 420, § 3). The language of the two acts, in this respect, is almost literally the same. By the act of January 23, 1832 (4 Stat. 496), the prohibition as to assignments and transfers of the right of pre-emption, contained in the act of 1830, is removed, and it is provided that "all persons who have purchased lands under the act of May 29, 1830, may assign and transfer their certificates of purchase, or final receipts, and patents may issue in the name of such assignee, anything in the act aforesaid to the contrary notwithstanding." This shows that the language in question was understood by congress as restricting alienations by the pre-emptor after payment and before patent issued.

The effect of allowing such transfers was seen to be such that congress, in passing the carefully-framed act of September 4, 1841, renewed the prohibition against transfers, which was contained in the act of 1830. The government had witnessed the practical operation of the two opposite policies, and the judgment of congress, as embodied in the later act, as to which is the better policy, should be respected by the courts, and the language of the statute should be allowed its natural and fair meaning.

Our attention has been called to no decision of the supreme court of the United States upon the point under consideration, and it is presumed it has never been determined by that tribunal. Thredgill v. Pintard, 12 How. [53 U. S.] 24, and Marshall v. Bush, 6 How. [47 U. S.] 284, are referred to by counsel, but the question now before us is one which, it is evident, was not ruled by the court in either of those cases.

The question has, however, been frequently before the state courts, and they have with great uniformity held that the pre-emptioner had no transferable right prior to the issuing of the patent. Arbour v. Nettles, 12 La. Ann. 217; Poirrier v. White, 2 La. Ann. 934; Penn v. Ott, 12 La. Ann. 233; Stanbrough v. Wilson, 13 La. Ann. 494; Stevens v. Hays, 1 Ind. 247; McElyea v. Hayter, 2 Port. (Ala.) 148; Cundiff v. Orms, 7 Port. (Ala.) 58; Glenn v. Thistle, 23 Miss. 42, 49; Wilkerson v. Mayfield, 27 Miss. 542; McTyler v. McDowell, 36 Ala. 39; Paulding v. Grimsley, 10 Mo. 210; Contra, Randall v. Edert, 7 Minn. 450 [Gil. 359].

If this is the true view of the statute, the deed from Johnson to Test was null and void, and neither by reason of the grant it purported to make, or the covenants it contained, can it operate as an estoppel; and any subsequent interest acquired by Johnson would not inure to the benefit of the grantee named in the deed. Stevens v. Hays and McElyea v. Hayter, ubi supra, are express authorities on this point.

To hold otherwise would enable parties easily to evade the statute, and defeat its policy and purpose; would contravene its plain language, and involve the legal absurdity of making an instrument declared by the law to be null and void, operate as effectually as if it was not under the ban of the statutory prohibition.

But it is not necessary in this case to deny that the title which a pre-emptioner gets by virtue of his patent will inure to the benefit of a grantee to whom he conveyed prior to the issue of the patent although the foregoing argument may go to that length. In the case at bar the pre-emptioner's entry was cancelled and he never obtained any patent, and we feel quite clear in holding, as we do, that under these circumstances the conveyance by way of mortgage made by Johnson, when a pre-emptioner, will not attach to an interest subsequently acquired by an independent purchase.

What would have been the rights of the grautee of the pre-emptioner had his entry never been cancelled, and had he subsequently received a patent, we have no occasion now to inquire, and give no opinion upon that question. But it is insisted that if the prohibition is applicable to the deed from Johnson to Test, it cannot avail the parties filing the bill of review, because they have not therein complained of this error in such a way as to apprise the defendants of their claim in this respect. Story, Eq. Pl. § 420; Id. § 636; 3 Daniell, Ch. Prac. 1729. The bill of review states the former bill, answer, and replication, and the proceedings thereon, and the decree entered therein. By the pleadings in the original cause it distinctly appears that Johnson's entry was made under the pre-emption act, and that the complainants therein claimed under the deed from Johnson to Test, and that the respondents set up as a defense its invalidity because made in violation of the provisions of the act of congress of September 4, 1841. The court affirmed the validity of the deed, and held that it operated by estoppel upon the interest which Johnson subsequently acquired, and subjected that interest to sale.

The bill of review alleges that the decree of July, 1867, "is erroneous, and ought to be reviewed, reversed, and set aside, for that, it appears by the said decree, this court declared (1) that under the pleadings in this cause the said deed of conveyance from said Harrison Johnson to said James D. Test in the said bill and decree mentioned was a security for and operated as a mortgage of the premises therein mentioned; (2) that said Johnson had such a title and interest in and to said lands in said bill and decree mentioned, as to give him a valid right to convey the same, and vest a valid right and interest in and to the said lands in his vendee; (3) that the alleged agreement in the said bill and decree mentioned was in law valid and effectual, and subject to be enforced in law as between the parties." When these allegations are examined in connection with the language of the pleadings and decree it is seen that they are reasonably specific as to the ground on which it is sought to impeach the decree.

This disposes of the case, and the result is that the prayer of the bill of review must be granted. It may be added that a careful examination of the evidence has satisfied the court that the writing produced is a true copy of the original agreement, and being so, Johnson has no interest in the lands, except what he would be entitled to, if any, by reason of the rejection of the claim of Smith; and it may also be added that we are inclined to the opinion that Smith's claim was improperly rejected. Let a decree be drawn up in conformity with this opinion, reversing and setting aside the former decree. Decree accordingly.